UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

F.L. and M.L., individually and on behalf of
F.L.,

                      Plaintiffs,

          -v-

THE NEW YORK CITY DEPARTMENT OF
EDUCATION,

                   Defendant.

------------------------------------------------------------- X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: June 8, 2016 |

15-cv-520 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

      F.L. and M.L. have sued the New York City Department of Education ("Department") individually and on behalf of their son, F.L. (ECF No. 1.) Their complaint alleges that the Department violated both federal law, in the form of the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 et seq., and state law, in the form of § 4404 of the New York State Education Law, by failing to provide F.L. with a free appropriate public education ("FAPE") for the 2013-2014 school year.

      Plaintiffs seek a determination from the Court that the Individualized Education Program ("IEP") and other materials the Department created for F.L.'s 2013-2014 school year were procedurally and substantively deficient and were not reasonably calculated to provide F.L. with a FAPE. Plaintiffs previously presented their claims to an Impartial Hearing Officer ("IHO") and a State Review Officer

("SRO"), both of whom determined that the Department's plan for F.L. was appropriate and thus that plaintiffs were not entitled to be reimbursed for the tuition cost at the private school in which they enrolled F.L. after rejecting the Department's proposed plan.  Before this Court, plaintiffs highlight five areas of claimed error: (1) absence of one-to-one instruction; (2) absence of vocational assessments and transition planning; (3) the timing and adequacy of school placement; (4) insufficiency of the Functional Behavior Assessment ("FBA") and Behavior Intervention Plan ("BIP") the Department prepared for F.L.; and (5) absence of extended day services.  (ECF No. 23 at i.)

The Court's role in an IDEA case like the instant matter is an important but properly circumscribed one.  In the instant case, each of the five areas of claimed error was addressed in both the IHO's decision and the SRO's decision.  After carefully reviewing both decisions, as well as the administrative records that were before both officers and which provide the objective basis for deciding this case, the Court determines that deference to the state officers below is appropriate, with one important exception.  On the question of one-to-one instruction, the SRO was not clear in his allocation of the burden of persuasion and thus failed to clearly determine the validity of the IEP.  The Court therefore GRANTS summary judgment to the plaintiffs in part and remands this matter for further proceedings on this question, and DENIES summary judgment to defendant.  (ECF Nos. 22 & 27.)

I.      FACTUAL BACKGROUND

      A.      <u>Overview of IDEA and Related State Law</u>

Before the passage of IDEA and its predecessor, the Education for All
Handicapped Children Act of 1975, "the educational needs of millions of children
with disabilities were not being fully met."  20 U.S.C. § 1400(c)(2).  IDEA seeks to
rectify that state of affairs by "require[ing] states receiving federal funds to provide
all children with disabilities a … FAPE."  <u>M.O. v. N.Y.C. Dep't of Educ.</u>, 793 F.3d
236, 238 (2d Cir. 2015) (internal quotation marks omitted).  "A FAPE consists of
special education and related services tailored to meet the unique needs of a
particular child, which are reasonably calculated to enable the child to receive
educational benefits."  <u>Id.</u> at 238-39 (quoting <u>Reyes ex rel. R.P. v. N.Y.C. Dep't of
Educ.</u>, 760 F.3d 211, 214 (2d Cir. 2014)).  IDEA ensures that all qualifying children
receive a FAPE by requiring that school districts annually provide each child with
an IEP, "a written statement that sets out the child's present educational
performance, establishes annual and short-term objectives for improvements in that
performance, and describes the specially designed instruction and services that will
enable the child to meet those objectives."  <u>Id.</u> at 239 (quoting <u>R.E. v. N.Y.C. Dep't of
Educ.</u>, 694 F.3d 167, 175 (2d Cir. 2012)); 20 U.S.C. § 1414(d).  The IEP must be
likely to produce progress, and the opportunity for more than mere trivial
advancement; at the same time, it is not required to furnish every special service
that might maximize each handicapped child's potential.  <u>Id.</u>

In New York, local Committees on Special Education ("CSEs") develop IEPs. Id.; N.Y. Educ. Law § 4402(1)(b)(1). A CSE includes the student's parent or parents, a teacher, a representative of the school board, a parent representative, and others. N.Y. Educ. Law § 4402(1)(b)(1)(a).

If, after a CSE meeting and the resulting IEP, a parent believes that their child is not receiving a FAPE, the parent may, at their financial risk, unilaterally enroll the child in a private school and seek tuition reimbursement from the school district. M.O., 793 F.3d at 239. The parent initiates this process by filing a due process complaint (which is a statutory feature of the IDEA, not a constitutional process). 20 U.S.C. § 1412(a)(10)(C)(ii); N.Y. Educ. Law § 4404(1). The board of education the appoints an IHO, who conducts a formal hearing and fact-finding to determine (I) whether the CSE's plan and placement for the student were appropriate and, if not, (II) whether the parent's chosen private school is appropriate and (III) whether the equities favor reimbursing the parent for their costs. N.Y. Educ. Law § 4404(a). The first prong requires consideration of both whether the IEP in question was developed according to the IDEA's procedural requirements and whether the educational plan it set forth was reasonably calculated to confer educational benefits on the student. Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998). A substantive violation (that is, an IEP not reasonably calculated to confer educational benefits) automatically leads to a finding for the parents on prong I, but procedural violations only do so if,

considered cumulatively, they impede the student's right to a FAPE.  R.E. v. N.Y.C.
Dep't of Educ., 694 F.3d 167, 190 (2d Cir. 2012).

Under New York law, the local school board bears the burden of establishing
the first prong and the parents bear the burden of establishing the second and
third.  M.O., 793 F.3d at 243.  An IHO's decision may be appealed to an SRO, and
an SRO's decision may be challenged by filing a civil action in state or federal court.
20 U.S.C. §§ 1415(g)-(i); N.Y. Educ. Law 4404(2)-(3).

B.    F.L.

F.L. is a (now 18-year-old, as of the summer of 2013 15-year-old) boy
diagnosed with autism who presents with significant delays in his receptive,
pragmatic, and expressive language and motor skills.  His autism significantly
impedes his ability to learn, communicate, and generally operate in the world.
(E.g., P-BB.[1])  He typically speaks one to three words at a time, and is learning to
speak in sentences.  (Tr. 192-93.)

F.L. has attended the McCarton School since 2002, when the school was
founded.  (Tr. 257.)  McCarton is a not-for-profit school that provides students aged
3-18 who are on the autism spectrum with an integrated educational model and
intensive Applied Behavior Analysis ("ABA") instruction, delivered by teachers and
therapists who work one-to-one with students.  (P-PP.)  F.L.'s school day runs from
8:45 a.m. to 4:45 p.m., and he attends McCarton all 12 months of the year.  (P-CC.)

---

[1] In this opinion, the Court adopts the following notations: "P-_" refers to a plaintiff exhibit in the administrative record; "D-_" refers to a defendant exhibit in the administrative record; "Tr. _" refers to the transcript of the hearings before the IHO; "IHO Dec. _" refers to the IHO's June 17, 2014 Findings of Fact and Decision; and "SRO Dec. _" refers to the SRO's October 23, 2014 Decision.

Although F.L. has long attended McCarton, the Department has remained responsible for preparing annual IEPs for him.  On January 23, 2013, the Department wrote to plaintiffs, seeking consent to test and assess F.L., which the Department had determined was "required as part of a requested reevaluation or mandated three-year evaluation." (D-10 at 1.)  Plaintiffs gave their consent and asked that they receive the results; they also requested that "FBA and Assistive Technology assessments [be] done as part of the mix of evaluations." (Id. at 2.)  By all accounts, the Department did not itself conduct any further evaluations of F.L. in preparation for his 2013-2014 IEP.

On April 24, 2013, F.L.'s CSE met to develop his program for the 2013-2014 school year.  The meeting's participants included F.L. (the student), his mother M.L., a Department special education teacher/district representative, a Department school psychologist, and F.L.'s lead teacher, speech therapist, ABA teacher and occupational therapist from McCarton, the four of whom participated by phone. (D-6 at 26.)  During the two-hour meeting, the group reviewed a number of materials, including the educational progress report, behavior support plan, occupational therapy progress report, speech and language progress report, and prescribed occupational therapy goals which the staff at McCarton had prepared for F.L. (D-14; D-15; D-16; D-17; D-18.)

Because F.L. attended school year-round, his 2013-2014 school year began on July 1, 2013; this was thus the date by which the Department had to have his IEP

in effect.  20 U.S.C. § 1414(d)(2)(A).  Plaintiffs received F.L.'s IEP on June 15, 2013. (P-N; D-6.)

The 25-page IEP detailed F.L.'s academic, social, physical, and management needs, identified postsecondary goals relevant to his adult life.  (D-6 at 1-4.)  It also listed 40 annual goals and the criteria, methodology, and frequency with which they would be assessed.  (Id. at 4-19.)  The IEP called for F.L. to learn in a "6:1+1" classroom, which means he would be one of six students who were being taught by one teacher, who was in turn assisted by one paraprofessional.  (Id. at 20.)  It also listed the occupational and speech-language therapies he would receive individually and in groups each week.  (Id.)  In addition, F.L. would have a dedicated crisis management paraprofessional assigned to him full time.  (Id.)  The IEP concluded by noting the other options considered, all of which featured higher student-to-teacher ratios and all of which were deemed less appropriate given F.L.'s cognitive, academic, and social/emotional needs.  (Id. at 24.)

The Department also generated an FBA and a BIP for F.L., both of which were dated April 24, 2013, the date of the CSE meeting.  (D-7; D-8.)

On June 19, 2013, plaintiffs wrote to the Chair of the CSE to inform her that they found the proposed IEP inadequate and inappropriate for a number of reasons, including insufficient one-to-one teaching intervention and support.  (P-N.)  The letter also noted that plaintiffs had not yet received a Final Notice of Recommendation ("FNR"), the document that would identify the school the Department proposed F.L. attend.  (Id.)

The date the FNR ultimately reached plaintiffs is contested: the document itself is dated June 14, 2013 (D-20); the envelope plaintiffs assert contained the FNR has a postage date of June 26, 2013 (ECF No. 24, Exh. C at 3[2]); M.L. testified at the IHO hearing that she "vaguely" remembered that she received the FNR "at the end of June" (Tr. 357); and plaintiffs wrote in an August 1, 2013 letter reiterating their opposition to the IEP and placement that they had received the letter after July 1, 2013.  (P-P.)  Whenever it arrived, the FNR identified F.L.'s school site as 75M226@02M420, and listed the address as High School for Health Professions and Human Services (M420), 345 East 15th Street, Manhattan, NY 10003.  (D-20.)

On July 3, 2013, plaintiffs made their initial due process demand, seeking an IHO determination that the Department's IEP did not provide F.L. with a FAPE. (P-A.)  Plaintiffs listed 123 claimed deficits and violations.  (Id.)

M.L. testified that she "called [the proposed placement school] several times" during late June and July 2013.  (Tr. 358.)  It is unclear whether she reached anyone and if so, what she learned; plaintiff's August 1, 2013 letter states that a Department representative told her that she was not able to visit the school and that the school was in session (P-P), but, according to the transcript, at the IHO hearing plaintiffs' counsel read the letter to say that the school wasn't in session, and M.L. agreed with that description.  (Tr. 359.)  In any event, M.L. went to the

---

[2] Although the envelope is not within the copy of the administrative record provided to the Court, the transcript of the April 11, 2014 IHO hearing demonstrates that it was properly admitted into evidence.  (Tr. 356-57.)

location on August 1, 2013 and found the building closed for renovations.  (Id.; P-P.)
Plaintiffs noted that fact in the August 1 letter that reiterated their opposition to
the IEP.  (P-P.)  The same day they also amended their due process demand to
include claims related to the school placement issue.  (P-B.)

IHO Susan Lushing conducted a hearing over five non-consecutive dates
between September 12, 2013 and May 27, 2014.  (IHO Dec. at 1.)  Each side was
represented by an attorney at each date, and the IHO received testimony from M.L.,
four McCarton employees, and the Department school psychologist who had been
part of F.L.'s CSE.  (Id. at 2-3.)  Each side submitted a post-hearing brief on May 30,
and the IHO rendered her decision on June 30, 2014.  (Id. at 17.)

The IHO's Findings of Fact and Decision is a 20 page document, of which 13
are a single-spaced account of the evidence she received and her reasoning.  (Id. at
4-16.)  The Court's description of the IHO Decision focuses on the five areas
plaintiffs continue to challenge.

The IHO addressed plaintiffs' argument that only ABA instruction, delivered
in a one-to-one setting with a teacher rather than paraprofessional, was
appropriate.  (Id. at 13-14.)  The IHO noted that F.L. received one-to-one instruction
at McCarton and that all parties agreed that he "required a 'significant amount of
support.'"  (Id. at 13.)  The IHO acknowledged that the McCarton witnesses
asserted that one-to-one support from a paraprofessional was inadequate and also
that a paraprofessional's educational background was likely less advanced than a
teacher's.  (Id. at 14.)  The IHO determined that this was not dispositive, because

"the paraprofessional is not in charge of instruction but rather serves as an arm of the classroom teacher who is qualified." (Id.)  In addition, the IHO noted that the IEP's plan would expose F.L. to daily interactions with more adults, serving the goal of generalization.  (Id.)  As to the method of instruction, the Decision stated that plaintiffs' argument that ABA had to be either implemented or considered was "predicated on a view that ABA is the sole method of instruction that could be used successfully," which the IHO determined was not warranted by the literature.  (Id.)

On the matter of F.L.'s assessments and evaluations, the IHO described IDEA's requirements and the McCarton documents the CSE had reviewed.  (Id. at 11.)  She credited the school psychologists' testimony "that the CSE had sufficient evaluation reports to make the appropriate recommendation," an opinion which was "supported by the length and detailed contents of the IEP itself."  (Id.)  However, her Decision also noted that the Department did not conduct a vocational assessment to address transition needs, in apparent violation of an IDEA requirement.  (Id. at 11-12, citing 20 U.S.C. § 1414(d)(1)(A)(viii) and 30 C.F.R. § 300.320(b).)  The IHO agreed with plaintiffs that an assistive technology assessment should have been performed and that the IEP's transition activities were "mostly generic, such as learn to travel independently by mass transit, rather than specific and realistic for the student."  (Id. at 12.)  Nonetheless, the IHO concluded that these omissions did not amount to a denial of a FAPE.  (Id.)

The IHO considered several aspects of the school placement decision.  As to its timeliness, she determined that there was an "unclear record," and did not find

10

that it was untimely received. (Id. at 14.) The IHO was more concerned with "the absence of any evidence in the record as to the school in question." (Id. at 15.) She recounted plaintiffs' argument that T.Y. v. New York City Department of Education, 538 F.3d 412 (2d Cir. 2009) required the Department to prove that the school could implement the IEP, as well as the Department's argument that R.E. v. New York City Department of Education, 694 F.3d 167 (2d Cir. 2012) stood for the proposition that any information about the school would be speculative because F.L. never attended it. (Id.) Although the IHO rejected the Department's broadest assertion, she nonetheless determined that in F.L.'s case "it is clear that the parent was rejecting the IEP recommendation primarily because it did not provide for 1:1 instruction," an objection that "would apply no matter what school was named." (Id.) Therefore, any deficiency on this point was not fatal to the Department's burden.

The IHO also rejected challenges to the IEP's goals and the FBA and BIP. She credited the school psychologist's testimony that, although the goals were developed in the context of McCarton's one-to-one ABA teaching program, their design was not tied to such a program, but was instead more broadly applicable. (Id. at 12.) Although the FBA and BIP were also developed based on McCarton documents, the IHO found that it was "not surprising that the information came from the providers who know him best," and concluded that the techniques and methods those documents called for were similar to those being used at McCarton. (Id. at 13.)

11

Finally, the IHO addressed the absence of extended day services in the IEP. She determined that F.L.'s global delays made after-school services appropriate for continuity and transition, and thus ordered that they be continued "for these limited purposes." (Id. at 16.)  Nevertheless, the IHO reasoned that the omission of the services she had ordered was not a denial of a FAPE. (Id.)

In light of all of the above, the IHO concluded that the DOE had prevailed on prong I and carried its burden to prove that F.L. was provided with a FAPE. (Id.) Although not strictly necessary, the IHO continued on to briefly address prongs II and III, as to both of which she determined the plaintiffs had carried their burden. (Id.)

Plaintiffs appealed the IHO's Decision to SRO Howard Beyer, and the Department cross-appealed the IHO's requirement that it provide F.L. with extended-day services as part of its IEP. (SRO Dec. at 5.)  The SRO issued his decision, which spans 22 single-spaced pages, on October 23, 2014, denying plaintiff's appeal and sustaining the Department's cross-appeal. (Id. at 22.)  As with the IHO's Decision, the Court's description of the SRO Decision focuses on the five areas plaintiffs continue to challenge.

The SRO examined the record on the question of whether F.L. necessarily needed a one-to-one teacher as opposed to a one-to-one paraprofessional. (Id. at 16-18.)  The SRO noted evidence that F.L.'s "interfering behaviors were managed with prompting and redirection," and saw "no reason to disturb the IHO's finding that a [one-to-one] paraprofessional can appropriately address this need." (Id. at 17.)

However, the SRO next delved into the constituent parts of the "instruction" F.L. received and required, such as safety monitoring, prompting, and refocusing. The SRO concluded that "it [was] not clear from the record that the activities constituting such 'instruction' cannot be provided by a paraprofessional." (Id.) Surveying the constituent parts of F.L.'s instruction needs, the SRO found that they "do not involve the provision of direct instructional services," but are instead "similar to those which supplementary school personnel are permitted to provide pursuant to State regulation." (Id. at 18.) In light of this, the SRO concluded that the IEP's plan of a "6:1+1" classroom and a one-to-one crisis management paraprofessional adequately met F.L.'s "need for 1:1 assistance related primarily to his interfering behaviors and difficulty remaining on task." (Id.)

The SRO agreed with the IHO and plaintiffs that the record did not indicate that the Department had conducted a vocational assessment of F.L. (Id. at 11.) Nonetheless, the SRO's review of the record convinced him that the materials the CSE had obtained from McCarton contained "sufficient information about the student's adaptive living skills needs and overall vocational abilities such that the lack of a formal vocational assessment in this instance did not … result in a denial of a FAPE." (Id.) The SRO recounted in detail the contents of both the McCarton documents and F.L.'s IEP transition goals, and disagreed with plaintiffs' assertions that the former were an inappropriate or inadequate foundation and that the latter were vague and insufficient. (Id. at 11-12.)

On the question of F.L.'s school assignment, the SRO's Decision first laid out the Department's legal obligations in choosing a particular school, including the fact that "parents generally do not have a procedural right in the specific location placement of their child."  (Id. at 20.)  The SRO concluded that the record indicated that plaintiffs received the FNR prior to July 1, 2013, and also that there was insufficient evidence that "the alleged non-receipt of this document had any bearing on the parent[s'] decision to reject the program offered to the student, which was done almost immediately after receiving the April 201[3] IEP itself."  (Id.)  The SRO cited the Second Circuit's precedent in R.E. and other cases for the proposition that "where an IEP is rejected by a parent before a district has had an opportunity to implement it, the sufficiency of a district's offered program must generally be determined on the basis of the IEP itself."  (Id.)  The SRO therefore concluded that the issues plaintiffs raised with regard to the school in which F.L. was placed were not an adequate ground to find a denial of a FAPE.

The SRO also examined the contents of the FBA and BIP that had been prepared for F.L.  (Id. at 12-14.)  He agreed with the IHO that the McCarton materials that had been relied upon as the foundation of these documents were appropriate and sufficient for that task.  (Id. at 13.)  He also noted that although "[t]he FBA included a baseline of the frequency, duration, and intensity of the student's behaviors" as well as "several triggers and purposes of the identified behaviors, results of previously attempted interventions, positive reinforcers for the student, and expected behavior changes," "this information was not included in the

14

April 2013 BIP." (Id.)  However, the SRO concluded that "[a]lthough the BIP did not include all of the required elements, in conjunction with the FBA and IEP the student's behavior needs were addressed." (Id.)

Finally, as to the need for after school, extended-day services, the SRO concluded that the absence of such services in the plan did not deprive F.L. of a FAPE, and moreover that the IHO had erred by ordering such services not found in the IEP. (Id. at 18-19.)  The SRO's review of the record convinced him that "the purpose of the after-school services was for the student to generalize skills to environments other than school," a task that several courts had held was beyond the requirements of IDEA. (Id. at 19.)  Therefore, because IDEA only ensures an appropriate education, not a maximized or ideal one, the lack of extended-day services was not an error, and the IHO's order that they be added to F.L.'s IEP was reversed.

This lawsuit followed. (ECF No. 1.)  The parties have cross-moved for summary judgment. (ECF Nos. 22 & 27.)

II.    STANDARD OF REVIEW

Although the parties have each moved for summary judgment, in the context of IDEA cases "the procedure is in substance an appeal from an administrative determination, not a summary judgment," and thus the Court looks beyond whether there are disputed issues of fact. Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005).  The availability of a motion styled as summary

judgment provides "a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in IDEA." Id.

Courts decide IDEA actions on the basis of the evidence developed during the administrative proceedings below, along with additional evidence the parties present. The burden to prove entitlement to relief by a preponderance of the evidence falls on the party challenging the SRO's decision, in this case plaintiffs. M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 225 n.3 (2d Cir. 2012).[3]

"[F]ederal courts reviewing administrative decisions must give due weight to [state administrative] proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Id. at 240 (quoting Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 113 (2d Cir. 2007). Rather than substitute its own policy views, a court should evaluate whether the administrative findings and determinations under review are "reasoned and supported by the record." Gagliardo, 489 F.3d at 114. Deference is particularly warranted where the record before the district court is the same as that before the SRO. M.H., 685 F.3d at 241.

At the same time, judicial review in IDEA cases must not be a mere "rubber stamp" for the decisions of state administrators. Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998). Where an SRO's conclusion is "against the weight of the evidence and thus flawed, deference is not warranted." R.E. v.

---

[3] It is worth emphasizing that although the plaintiffs bear the burden of proving their entitlement to relief in this proceeding, that fact does not alter the burdens applicable in the underlying administrative proceedings under state law. See Section I.A, supra.

N.Y.C. Dep't of Educ., 694 F.3d 167, 194 (2d Cir. 2012).  In addition, courts do not defer to state officers with respect to issues of law, such as the proper interpretation of federal statutes.  Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 82 (2d Cir. 2005).

III.   DISCUSSION

    A.   One-to-One Instruction

Plaintiffs' initial argument is that the Department failed to consider and then implement a plan under which F.L. would receive one-to-one teaching instruction, and that this failure was fatal to F.L.'s IEP.  The record demonstrates that the state officers below considered F.L.'s one-to-one needs in some depth and drew conclusions as to how they could be met.  However, the SRO's opinion suggested that he may have misapplied the relevant burden of persuasion in determining whether the Department provided F.L. with a FAPE.  The Court therefore finds that it is necessary to remand this question for further review with a clear focus on the applicable burden of persuasion.

As discussed above, both the IHO and the SRO addressed plaintiffs' arguments that F.L. could not learn without one-to-one teaching.  The SRO's decision broadly endorsed the IHO's finding that the 6:1+1 plan in F.L.'s IEP was adequate to account for F.L.'s needs.  However, a significant portion of the SRO's reasoning dealt with an in-depth analysis of the specific skills and tasks that went into the one-to-one "instruction" that F.L. was alleged to need.  (SRO Dec. at 17-18.) In support of his conclusion that F.L. did not need a full-time one-to-one teacher,

the SRO wrote that "it is not clear from the hearing record that the activities constituting such 'instruction' cannot be provided by a paraprofessional." (Id. at 17.)

This formulation appears to reverse the burden applicable in the proceedings before the IHO and SRO.  As discussed above, under New York law the local school board bears the burden of establishing the validity of its educational plan for the student.  M.O. v. N.Y.C. Dep't of Educ., 793 F.3d 236, 243 (2d Cir. 2015) (citing N.Y. Educ. Law § 4404(1)(c).  It is not the parents' obligation to create a hearing record from which it is "clear" that necessary services are not being provided. Notwithstanding the SRO's explicit recognition of the correct standard elsewhere in his opinion (see SRO Dec. at 7), within the discussion of whether the IEP met F.L.'s one-to-one instruction needs the SRO appears to have held ambiguity in the record against the parents.

The ambiguous phrasing not only obscured the placement of the burden of persuasion in the SRO's analysis – it also prevented the SRO from reaching a clear determination on a central issue in this case.  The record is clear that F.L. requires some form of one-to-one support.  If this support can be fully provided by a paraprofessional this aspect of the Department's IEP would not deny F.L. a FAPE. If, on the other hand, the one-to-one support F.L. requires is beyond the purview or capability of a paraprofessional the IEP falls short.  The state administrative officers charged with evaluating F.L.'s IEP must reach a determination on this question one way or the other, and the SRO's statement that "it is not clear from

18

the hearing record that the activities constituting such 'instruction' cannot be provided by a paraprofessional" does not provide the necessary resolution.

In light of the above, remand to the state administrative process for further evaluation of the one-to-one instruction issue is necessary.  The state officer should clearly state the relevant legal burdens and make factual findings as to whether this aspect of F.L.'s IEP denied him a FAPE.

      B.    <u>Vocational Assessments and Transition Planning</u>

Plaintiff's second argument is that the Department's failure to perform a vocational/transition assessment of F.L. as required by statute, when combined with allegedly improper transition planning in the IEP, denied F.L. a FAPE. However, the record indicates that F.L.'s IEP contained appropriate transition goals and activities which were developed from adequate sources of information.  The Court therefore agrees with the conclusion of both officers that this aspect, although a procedural violation of statute, did not deny F.L. a FAPE.

The IDEA, federal regulations, and New York law all direct school districts to focus on preparing the students they educate with the skills they need to navigate post-school life, including continued education, employment, and independent living.  The IDEA requires that the IEP of a student 16 years old or older contain, <u>inter alia</u>, "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills."  20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa).  New York extends this requirement to 15-year-olds, and thus to F.L. at the relevant

19

time.   8 N.Y.C.R.R. § 200.4(d)(2)(ix)(b).  Because the statutory scheme requires that
IEPs include goals based on transition assessments, it implicitly requires that those
assessments be performed.

The parties and both state officers agree that "there is no indication in the
record that the district conducted a vocational assessment of the student."  (SRO
Dec. at 11.)  However, the CSE did have access to materials from McCarton which
included goals for domains beyond academics, including safety and work-related
skills.  (Id.; D-18 at 5, 12.)  All parties also agree that F.L.'s IEP includes a
"Coordinate Set of Transition Activities," which includes such activities as
"continu[ing] to develop his computer skills," "learn[ing] to travel independently,"
and "utiliz[ing] learned cooking skills to measure accurately in order to cook for
himself/others."  (D-6 at 21-22.)  The IHO labeled these activities "mostly generic."
(IHO Dec. at 12.)  The SRO was more impressed, and pointed out that other
portions of the IEP also contained goals focused on F.L.'s life after he left secondary
education, such as "partaking in internships and part/full time work," "being able to
sign his name independently," and "independently utilize[ing] a safety checklist by
replying yes/no to the questions asked while cooking."  (SRO Dec. at 12; D-6 at 4,
16-17.)

In light of the measurable goals in F.L.'s IEP and the SRO's evaluation of
their adequacy, the Court concludes that the Department complied with its
statutory requirements to establish appropriate postsecondary goals.  The
particular goals listed in the IEP are concretely measurable and not so generic that

they fail to constitute a plan for F.L.; they are written at the same level of generality as the McCarton plans.  And while the failure to conduct a vocational assessment was a procedural violation, the Court agrees with the unanimous view of the state officers below that the CSE had sufficient equivalent information at its disposal such that this violation did not amount to a denial of a FAPE for F.L.

C.    Underline: School Placement

Plaintiffs' third argument attacks the process by which F.L. was assigned to a particular school and the result of that assignment.  Plaintiffs identify three alleged errors in connection with school assignment: the timeliness of the assignment; the school's closure at the start of F.L.'s 12-month school year in July 2013; and the Department's failure to provide affirmative proof of the school's capacity to implement F.L.'s IEP during the hearing process below.  None of these issues require reversal of the SRO's conclusions regarding school placement.

The timeliness of the Department's placement decision need not detain us long.  The evidence in the record on this question is mixed.  The FNR is dated June 14, 2013 (D-20); the envelope it came in has a postage date of June 26, 2013 (ECF No. 24, Exh. C at 3); M.L. testified that she "vaguely" remembered receiving it "at the end of June" (Tr. 357); and plaintiffs wrote in an August 1, 2013 letter reiterating their opposition to the IEP and placement that they had received the letter after July 1, 2013.  (P-P.)  The paucity of, and conflict between, the record evidence on this point does not permit the Court to substitute any finding of fact for those made by the officers below.

21

The unrefuted evidence that the school identified in the FNR as F.L.'s assignment was closed at least at the start of his twelve-month school year in July 2013 is a more serious issue.  The most relevant precedent is <u>C.F.</u>  In that case, a defense witness testified before the IHO that "while C.F.'s proposed placement started in July, the site was not ready until September."  746 F.3d at 74.  Until then, the placement was housed in another public school, to which the witness testified any parent attempting to visit the site would have been directed.  <u>Id.</u> at 75.  The plaintiffs in that case alleged error in their exclusion from site selection.  The Second Circuit "acknowledge[d] the difficulties that Plaintiffs had in communicating with the school site," but found that these issues did not violate IDEA procedures based on precedent that established that statutory references to "educational placement" refer to programs, rather than locations.  <u>Id.</u> at 79 (citing <u>T.Y. v. N.Y.C. Dep't of Educ.</u>, 584 F.3d 412, 419 (2d Cir. 2009)).

Although <u>C.F.</u> cuts in favor of the Department's argument that any school closure did not deny F.L. a FAPE, plaintiffs point out that in that case district officials testified about the relocation of the school during the construction period.  No similar testimony from a Department witness appears in the record in the instant case.

Plaintiffs also cite three district court opinions that have held that "parents have a procedural right to evaluate the school assignment, <u>i.e.</u>, the right to acquire relevant and timely information as to the proposed school."  <u>C.U. v. N.Y.C. Dep't of Educ.</u>, 23 F. Supp. 3d 210, 227 (S.D.N.Y. 2014); <u>F.B. v. N.Y.C. Dep't of Educ.</u>, No. 14

Civ. 3902 (PAE), 2015 WL 5564446, *12 (S.D.N.Y. Sept. 21, 2015) (quoting <u>C.U.</u>, 23

F. Supp. 3d at 227); <u>V.S. v. N.Y.C. Dep't of Educ.</u>, 25 F. Supp. 3d 295, 299 (E.D.N.Y.

2014) (same).  Plaintiffs argue that the school's summer closure for reconstruction

prevented them from evaluating its ability to implement the IEP and thus

amounted to a procedural violation which, in conjunction with other violations,

denied F.L. a FAPE.

The full record of this case indicates that it is more closely aligned with the

facts of the Second Circuit's decision in <u>C.F.</u> than the district court decisions

plaintiffs cite.  Although the transcripts of the proceedings before the IHO do not

contain a clear statement of the location of the assigned school during

reconstruction, plaintiffs' August 1, 2013 letter reports a conversation between

plaintiffs and a district representative in which plaintiffs learned that, although

construction was proceeding at the school's permanent location, "the school was in

session."  (P-P at 1.)  The Second Circuit has held that the question of "educational

placement" relates to the type of program, rather than the physical location.  <u>See</u>

<u>C.F.</u>, 746 F.3d at 79; <u>T.Y.</u>, 584 F.3d at 419.  Therefore, under these circumstances,

"the difficulties that Plaintiffs had in communicating with the school site … did not

violate the procedures of the IDEA."  <u>C.F.</u>, 746 F.3d at 79.

The third component of plaintiffs' arguments related to the school placement

concerns the burden of proof before the IHO.  Plaintiffs contend that the

Department "must prove that it can implement the IEP at a school placement," and

cite <u>K.R. ex rel. Matthew R. v. New York City Department of Education</u>, 107 F. Supp. 3d 295 (S.D.N.Y. 2015) in support of this view. (ECF No. 23 at 19.)

However, <u>K.R.</u> only stands for the proposition that there is no blanket prohibition on evidence regarding a proposed placement's ability to implement an IEP on the ground of retrospectivity.  <u>See</u> <u>id.</u> at 301-02.  The court in <u>K.R.</u> did not, as plaintiffs argue, impose a burden of production on the Department to provide evidence that its proposed placement would have been able to implement an IEP absent a concrete basis in the record to doubt that capacity.  "To the contrary, 'plaintiffs bear the burden of proof on prospective challenges to the adequacy of a proposed placement.'" <u>J.S. v. N.Y.C. Dep't of Educ.</u>, 104 F. Supp. 3d 392, 413 (S.D.N.Y. 2015) (internal alteration omitted) (quoting <u>S.W. v. N.Y.C. Dep't of Educ.</u>, 92 F. Supp. 3d 143, 162 (S.D.N.Y. 2015); <u>see also</u> <u>R.E. v. N.Y.C. Dep't of Educ.</u>, 694 F.3d 167, 186 (2d Cir. 2012) ("[T]he IEP must be evaluated prospectively as of the time of its drafting….").

Because the Department did not bear the burden of affirmatively proving that its recommended placement could implement F.L.'s IEP, at least absent a concrete and particularized challenge to that capacity, this final challenge to the assigned school does not demonstrate that the choice of school deprived F.L. of a FAPE.  In combination with the timeliness and closure issues discussed above, the state officers' decisions on school placement merit deference.

D.    FBA and BIP

Plaintiffs challenge the adequacy of the FBA and BIP prepared for F.L.  (D-7,

D-8.)  Plaintiffs' specific arguments against these documents point to the fact that

the FBA does not capture the frequency of the problem behaviors it identifies and

an allegation that there is an inadequate link between the behaviors identified and

the goals prescribed.

The SRO addressed precisely these points in his decision.  He noted that "the

four behaviors targeted on the BIP were the same as those included in the FBA and

the McCarton behavior support plans," and that "the FBA and the April 2013 IEP

included intervention strategies linked to the student's behaviors."  (SRO Dec. at

13.)  The SRO acknowledged the BIP's shortcomings but nonetheless determined

that "in conjunction with the FBA and IEP the student's behavior needs were

addressed." (Id.)  The IHO similarly found that the FBA, BIP, and IEP, taken

together, "satisfie[d] the requirements of the IDEA."  (IHO Dec. at 13.)  Plaintiffs do

not present any significant justification to depart from these reasoned conclusion,

and the Court therefore concludes that the officers' decisions on this point merit

deference.

E.    Extended Day Services

Plaintiffs' final claim of error before this Court concerns the absence of

extended days services from F.L.'s IEP and the SRO's decision that such services

were not necessary to provide F.L. with a FAPE after the IHO had decided that

they were.  This argument is unavailing because plaintiffs do not offer any reason to

depart from the SRO's determination that these services were aimed at generalizing skills outside of the classroom, and thus not required by the IDEA.

As discussed above, the IHO and SRO differed on the question of extended day services. The IHO ordered that 6 hours of weekly extended ABA services and 90 minutes of weekly OT services be added to F.L.'s IEP because, given F.L.'s delays and his receipt of such services at McCarton, they were "appropriate for continuity and transition." (IHO Dec. at 15-16.) The SRO reversed because "the student's private school and home-based team providers all testified that the purpose of the after-school services was for the student to generalize skills to environments other than school." (SRO Dec. at 19.) He also noted that McCarton witnesses testified that F.L. could still make academic progress without these services. (Id.)

The SRO's decision cited a number of other circuits that have held that the IDEA does not require generalization of skills across settings outside of the classroom. See, e.g., Thompson R2-J Sch. Dist. v. Luke P., 540 F.3d 1143, 1150 (10th Cir. 2008); Gonzalez v. Puerto Rico Dep't of Educ., 254 F.3d 350, 353 (1st Cir. 2001). District courts in this Circuit have reached the same conclusion. See, e.g., P.S. v. N.Y.C. Dep't of Educ., No. 13 Civ. 04772(LGS), 2014 WL 3673603, *13 (S.D.N.Y. July 24, 2014). Plaintiffs offer no principled basis which might lead the Court to conclude that the SRO was wrong in either his factual description of the extended day services at issue or his legal conclusions as to the IDEA's requirements. Therefore, the Court defers to the SRO's decision on this final point.

26

IV.     CONCLUSION

For the reasons stated above, plaintiffs' motion for summary judgment is GRANTED in part, and defendant's cross-motion for summary judgment is DENIED.  This matter shall be remanded to state administrative proceedings for consideration of the one-to-one instruction issue with a proper application of the burden of persuasion.  The Clerk of Court is directed to terminate the motions at Docket Nos. 22 and 27.


        SO ORDERED.

Dated:          New York, New York
                June 8, 2016

                                        _____
                                          KATHERINE B. FORREST
                                          United States District Judge